1                    UNITED STATES DISTRICT COURT
                       DISTRICT OF MASSACHUSETTS
2
    * * * * * * * * * * * * * *
3   UNITED STATES OF AMERICA      *
                                  *
4            vs.                  *        CRIMINAL ACTION
                                  *        No. 08-10377-JLT
5   GERARD SASSO                  *
                                  *
6   * * * * * * * * * * * * * *

7              BEFORE THE HONORABLE JOSEPH L. TAURO
                   UNITED STATES DISTRICT JUDGE
8                          **DISPOSITION**

9   A P P E A R A N C E S

10           OFFICE OF THE UNITED STATES ATTORNEY
             1 Courthouse Way, Suite 9200
11           Boston, Massachusetts 02210
             for the United States
12           By:  Donald L. Cabell, AUSA
                  William D. Weinreb, AUSA
13
             FEDERAL PUBLIC DEFENDER OFFICE
14           51 Sleeper Street, Fifth Floor
             Boston, Massachusetts 02210
15           for the defendant
             By:  Ian Gold, Esq.
16

17
                                  Courtroom No. 22
18                                John J. Moakley Courthouse
                                  1 Courthouse Way
19                                Boston, Massachusetts 02210
                                  January 10, 2011
20                                2:25 p.m.

21

22              CAROL LYNN SCOTT, CSR, RMR
                   Official Court Reporter
23            One Courthouse Way, Suite 7204
              Boston, Massachusetts 02210
24                  (617) 330-1377

25

```
 1                    P R O C E E D I N G S

 2            THE CLERK:  All rise for the Honorable Court.

 3            THE COURT:  Good afternoon, Everybody.

 4            VOICES:  Good afternoon, Your Honor.

 5            THE CLERK:  This is criminal matter No. 08-10377,

 6    United States of America versus Gerard Sasso.  Counsel

 7    please identify themselves for the record.

 8        MR. WEINREB:  Good afternoon, Your Honor.  William

 9    Weinreb for the United States.

10            THE COURT:  Good afternoon.

11        MR. CABELL:  With him, Donald Cabell for the United

12    States, Your Honor.

13        MR. GOLD:  Good afternoon, Your Honor.  Ian Gold on

14    behalf of the defendant Gerard Sasso.

15            THE COURT:  Okay.  Sit down everybody.

16            Okay.  We are here for disposition; is that it?

17            MR. WEINREB:  Yes, Your Honor.

18            THE COURT:  The government has a recommendation

19    here?

20        MR. WEINREB:  Yes, Your Honor.  The government

21    has -- we've set forth in our sentencing memorandum --

22            THE COURT:  I have read them all.  You can go over

23    them certainly but I just want you to know I have read all

24    your memos.

25        MR. WEINREB:  Your Honor, I just want to make three
```

1    quick points here and I'll sit down.

2              **THE COURT:**  Go ahead.

3              **MR. WEINREB:**  One is, without belaboring all the

4    facts of the case, this was essentially an assault upon

5    police officers.  The jury found that it was intentional

6    willful conduct done with reckless disregard for the life

7    and safety of the officers.  These are officers doing their

8    duty.

9              Although they weren't injured in this case, you

10   heard testimony about what it's like to fly a helicopter at

11   night in Boston under these circumstances.  It easily could

12   have resulted in injury and I think that that kind of an

13   assault on police officers warrants a punishment.

14             Secondly, this was a police helicopter engaged in

15   guarding an LNG tanker going through Boston Harbor.

16   Although there is no allegation from the government that the

17   defendant knew that, when you engage in criminal conduct,

18   you take the situation as you find it.

19             As a result of his conduct, that helicopter had to

20   abandon its mission.  He was shining that laser beam in the

21   direction of planes landing at Logan Airport.  He kept

22   shining it at the helicopter, even as they tried to avoid

23   it.  They didn't have much choice but to go and try to hunt

24   him down as a result of that.  The most important piece of

25   the security apparatus for that tanker had to leave what it

1    was doing.

2            And the third thing I'd emphasize is that what, the

3    sentence the Court gives in this case is going to send a

4    message because this is a very big, growing problem in the

5    United States as we document in here.  And it's the first

6    prosecuted case in federal court of this type in Boston.

7            And I submit that it's important to send a message

8    that this is not simply something that you are going to get

9    a slap on the wrist for.  It's a serious crime.  It's a

10   dangerous crime and it warrants a substantial punishment.

11           The government does not have a specific

12   recommendation other than a sentence in the range of two to

13   three years.  That is a typical sentence in cases of this

14   type as we've shown in this memoranda.

15           **THE COURT:**  Within the Guideline range?

16           **MR. WEINREB:**  Yes, Your Honor.

17           **THE COURT:**  The Guideline range is what?  Two and a

18   half?

19           **THE PROBATION OFFICER:**  27 to 33 months, Your

20   Honor.

21           **THE COURT:**  27 to 33.

22           **MR. WEINREB:**  We have made the argument that the

23   guideline -- that the offense level should be 24.  I won't

24   argue it further except to say that, you know, there is a

25   four-point upward adjustment for using a dangerous weapon in

1      the commission of the offense.

2           As I'm sure that the Court is aware from state

3      court as well as federal court, dangerous, to be a dangerous

4      weapon doesn't have to be a gun or a knife, it can be

5      anything that is used in a way that commits this dangerous

6      crime as we have set forth the legal details in there.

7           And although the sentence we're recommending is

8      within the lower range as well as the higher range that's

9      warranted if it's a dangerous weapon, we do think that that

10     adjustment applies.

11          **THE COURT:**  Okay.  Mr. Gold, do you want to be

12     heard?

13          **MR. GOLD:**  Yes, Your Honor.

14          As the Court is aware, we, based in large part on

15     Mr. Sasso's psychiatric problems and his status as an

16     ex-correctional officer, a sentence of imprisonment in his

17     particular case I think would be more painful than usual.

18          And in our papers, and Mr. Sasso himself, he really

19     does experience, in the midst of a condition that we

20     describe, genuine remorse for what he did back in December

21     of 2007, recognizes that sending a message is an important

22     function in criminal law and we come up with a proposal of

23     home detention which would serve that communicative function

24     which we recognize as important.

25          I do have to take issue with a couple of points

1    that the government has relied on.

2            First of all, as we pointed out in our papers this

3    morning, there have been four of these cases that the

4    government cites as having precedential value in the

5    District, Central District of California, Eastern District

6    of California.  In none of those cases did the government,

7    the defense, Probation or the Court find that this dangerous

8    weapon enhancement applied.  Probation in this case did not

9    determine that it applied.  It doesn't apply.

10           The Guideline range is what it is, a level 18 with

11   a 27 to 33 month range.  We argue that that is too high in

12   this case.  It is too high for Mr. Sasso.  It is not

13   necessary to deter Mr. Sasso for future crimes of this type.

14   And I think the only reason that we're here is because of

15   this communicative purpose of the criminal law.

16           And then, you know, we cite the recent case of the

17   young man in upstate Massachusetts, in Lawrence, who

18   targeted the same pilot a similar amount of times in a

19   situation that was arguably more dangerous and he got a pass

20   so it's certainly --

21           **THE COURT:**  He got a pass, meaning what?

22           **MR. GOLD:**  The federal government declined

23   prosecution in the case and his case was recently resolved

24   with a CWOF, with community service for essentially -- it's

25   a laser strike against the same pilot.

1            **THE COURT:**  This took place where?

2            **MR. GOLD:**  In Lawrence, Massachusetts.  The Court

3     heard testimony back in January from Lieutenant Riley --

4            **THE COURT:**  Yes, I think --

5            **MR. GOLD:**  -- that's where they land.  And so as he

6     was coming in for a landing --

7            **THE COURT:**  In whose court was that?

8            **MR. GOLD:**  What's that?

9            **THE COURT:**  Who was the judge in that case?

10           **MR. GOLD:**  There was -- you know, I don't know.  It

11    was a district court, state district court.  It was not

12    adopted.  Mr. Weinreb considered it for prosecution.  It's

13    my understanding it was not adopted.

14           **THE COURT:**  When you say "district court," you

15    don't mean United States District Court?

16           **MR. GOLD:**  No, no, I mean state district court.

17           **THE COURT:**  Oh, all right.

18           **MR. GOLD:**  State district court.

19           But, you know, to the extent that this is a -- this

20    is -- the idea that this is a pressing problem, well, it is

21    but as we point out in our papers, this is going on.  These

22    lasers are widely available.

23           In the literature that you read about them, you can

24    buy them, they're on EBay.  People find it diverting or

25    entertaining to point them out the window and they're

1    pointing them at airplanes.

2          Back in 2005 --

3          **THE COURT:**  Doesn't that argue for general

4    deterrence, that they ought to know that if they point at

5    airplanes, they go to jail for a long time?

6          **MR. GOLD:**  Well, Your Honor, I think one way, you

7    know, and in our papers we deal with this point really

8    directly head on.  That's one function of the criminal law.

9    But these people aren't arguing -- acting with criminal

10   intent a large part of the time.

11          **THE COURT:**  Reckless indifference.

12          **MR. GOLD:**  What's that?

13          **THE COURT:**  Reckless indifference.

14          **MR. GOLD:**  Well --

15          **THE COURT:**  Almost the same thing.

16          **MR. GOLD:**  Judge, the literature on this that we

17   cite, people who are thinking about it and talking about it,

18   talk about how people need to be educated.  These things

19   come with warnings that you don't shine them in your eyes

20   but they don't come with -- and people don't necessarily

21   have the understanding that -- Mr. Sasso certainly didn't --

22   that the device can reach the extreme distances that it can.

23          You know, we talk a lot about these cases in the

24   papers and the papers I filed just this morning.  The

25   government argues that this case was, had aggravating

1    circumstances that aren't present in other cases but, in

2    fact, I think a look at the other cases indicates that

3    that's not true, that it's fairly accepted that this is a

4    problem where people are pointing these lasers at

5    helicopters without necessarily knowing the dramatic effects

6    that they can have.

7         The government argues that Mr. Sasso lied but, you

8    know, given the psychiatric problems and the background

9    that he's coming with, I think an accurate understanding of

10   what that was about is, you know, he panicked and in a panic

11   he tried to put them off for a few minutes until he broke

12   down crying.  And the cold, calculating liar who deserves

13   additional punishment for that is not the same guy as the

14   guy who breaks down crying and says, I'm sorry, I did it,

15   and take them, take these lasers.

16        Mr. Sasso is someone who has some part of

17   obsessive-compulsive disorder as part of the clinical

18   picture there.  On EBay he's bought various items.  Lasers

19   were one of those items.  He was out his back window smoking

20   cigarettes at the time that this helicopter was -- and this

21   is the acknowledged testimony -- when it was first struck,

22   it was almost too far away to be seen except that it had

23   lights on it.  It was very small.

24        Some of the cases that the government cites as

25   representative all involve the same pattern where someone is

1    intentionally or is shining the laser at aircraft coming in

2    for a landing.  Then the helicopter comes to investigate and

3    that laser (sic) gets lased, that's how the person is

4    ultimately identified.

5         This case is a little different.  This is the

6    initial, sort of, hey, what is that, what is that.  The

7    testimony is that in a ten-minute period the laser was

8    flitting around and flitting back to them about five times

9    in a ten-minute period.  And I have always -- the way those

10   facts speak to me, and I guess there's a quite, you know,

11   some difference of opinion here, is someone who is not

12   acting with the malicious intent that this statute in

13   particular was aimed at.

14        And I would --

15        **THE COURT:**  It is deliberation; isn't it?  Five

16   occasions in ten minutes.

17        **MR. GOLD:**  Well, that's one view of it.  I mean,

18   deliberation --

19        **THE COURT:**  Well, I am asking you, is that a

20   reasonable view?

21        **MR. GOLD:**  Well, to me, we know that Mr. Sasso sat

22   at the back window.  He bought the lasers some five months

23   before.  He admitted to the psychiatrist in the context of

24   his evaluation that he had in the past pointed it at

25   aircraft without any sense that it could be perceived by the

1    pilots in the aircraft.  That's what he said.

2         So does it indicate intent to interfere with the

3    pilots as opposed to idling pointing it at it while in the

4    context of pointing at other things?  I mean, that's the

5    picture that we're trying to draw, I mean, that we're really

6    trying to lay out here, of someone who is a diminished

7    person, Your Honor, who spends his time in his apartment

8    who, as he does, you know, several times a day with these

9    devices, was out the back window, smoking a cigarette, not

10   intending anyone any harm, pointing the laser at what he saw

11   outside his window, which are the rooftops of the

12   surrounding houses and the sky up into the distance.

13        The purpose of these devices is to point it.  It is

14   diverting.  We bought one in the terms of working -- in the

15   context of working up this case and they're a little

16   addictive to point at things.

17        And, you know, in that context he hit this

18   helicopter, you know, what we argue is, you know, it is what

19   it is, you know, five times over a ten-minute period.

20   That's once a minute.  Lieutenant Riley testified that it

21   would point up.  Sometimes he thought they flew through it.

22   Sometimes he thought it seemed to be tracking them.

23        The government listed these cases, each one, and

24   our papers I think are different.  First of all, they, there

25   was no question of why these people were in the federal sort

1    of microscope.  All of them had substantial criminal

2    histories.

3         There is reference to multiple air strikes on

4    multiple aircraft, continuously targeting aircraft as

5    opposed to what happened here.

6         So, you know, Judge, in -- I mean, I could go into

7    individual cases.  I mean, one of the things about the four

8    cases that we've discovered in the Central District of

9    California is all of them require the specific intent to

10   interfere with the operator.

11        Here I think what the jury verdict supported was

12   intentionally pointing the laser at the helicopter with

13   this, what the jury regarded as recklessness, reckless

14   disregard for the safety of the occupants of the aircraft.

15   He should have known but it's not necessarily, and I don't

16   think the facts support in any way that he was intentionally

17   or even knew that the helicopters could perceive what he was

18   doing.

19        At that distance the device is no longer as

20   powerful, although obviously it can be perceived.  The other

21   cases that the government cites, there are people standing

22   right underneath 700 feet away, a few hundred feet away, who

23   are close enough to cause the pilots momentary injuries.

24        And Lieutenant Riley testified here that it didn't

25   have any of the visual effects that are the main danger that

1    people talk about when they're talking about this type of

2    issue.

3         Your Honor, it would be very disruptive to

4    Mr. Sasso to send him to jail for an extended period.  And

5    the proposal that we have of strict home confinement at

6    least serves to meet some of the government's legitimate

7    concern that we want to advertise that this is serious

8    business.

9         But, again, another one of the cases that they

10   cite, they cite, Your Honor, is a case in which a man was

11   pointing a laser at a helicopter and a few weeks before the

12   helicopter had hovered over the same neighborhood and said

13   don't do that anymore, we're going to arrest you, we don't

14   like it and then that man had done it again.

15        The facts here are, simply speak in a different

16   way, that this is someone who's not shining the -- you know,

17   he goes inside before they're even able to locate exactly

18   where he is.  There is police on the street interviewing

19   Mr. Sasso's neighbors who actually bring the police to the

20   specific apartment where he was.  So it's not a case of

21   someone who is really trying to get in their eyes.  It's

22   someone who is sort of idling pointing it without that

23   culpability which merits harsh punishment.

24        **THE COURT:**  Is that it?

25        **MR. GOLD:**  Yes, Judge.

1        **THE COURT:**  Do you have anything else you want to

2   add?

3        **MR. WEINREB:**  I'll just say, Your Honor, that there

4   is no question that he did it on purpose.  His own expert

5   testified that the chances of it happening by accident were

6   over one in a million.  He struck them five times, each time

7   for five or six seconds and the helicopter was getting

8   closer and closer and closer to his house so it may have

9   been far away the first time he did it but it wasn't far

10  away the last time he did it.  It was close enough that they

11  were pretty much able to zero in, not just on the house but

12  on the window that it was coming out of.

13       This kind of thing happens hundreds, thousands of

14  times a year.  The reason you don't see hundreds and

15  thousands of prosecutions is because it's really hard to

16  track down the people who are using these lasers.  You know,

17  they're often in the dark.  It's happening at night.  They

18  strike the helicopter with the laser and then they run away.

19  How are we ever going to find them?

20       This was a case, a particularly egregious case

21  where he kept doing it and doing it and doing it as the

22  helicopter got closer and closer and closer so that they

23  were finally able to see who it was and to grab him.

24       The idea that the helicopter accidently went

25  through the laser beam, that's just preposterous.  Talk

1    about a gigantic night sky and the helicopter flying around

2    in a sort of pinpoint laser beam, he was tracking them.  He

3    was striking them over and again.  And he even said to the

4    psychiatrist who interviewed him that he had struck

5    airplanes in the past and that he didn't keep the light on

6    them for very long because he knows that lasers are also

7    used as sites on weapons and he didn't want the airplanes to

8    think they were being targeted by a weapon.

9         So he certainly knew, he had it in his mind that

10   this beam could be perceived by these aircraft that are

11   flying through the sky.

12        As for the idea that in other cases they require

13   something more than what they require in this case,

14   that's -- the elements of the crime are the elements of the

15   crime.

16        As the jury was instructed here, that they had to

17   find that it was intentional conduct.  Any reasonable person

18   would have known that they would be interfering with the

19   pilot if they did this thing and that it was done with

20   reckless disregard for the life or safety of the pilots.

21   That's exactly what he did here and he did it to two police

22   officers who are on a difficult mission guarding the LNG

23   tanker.

24        Those are the aggravating circumstances here, or

25   among them, that are different from all these other cases

1    even where people got two to three years.

2           This was a very serious matter.  It wasn't just a

3    kid, you know, doing something for a second and then

4    realizing he made a mistake.  It was a guy, a grown man

5    doing something extremely dangerous repeatedly and then

6    lying about it.  And it wasn't just like he lied for a few

7    minutes and broke down in tears.  The officers testified

8    that they were in there talking to him for 10, 15 minutes,

9    keeping him going.  And he didn't admit that he had that

10   helicopter -- that he had, was the guy who did the lasing

11   until they caught him in a lie.  He kept denying that he had

12   any lasers and then they wandered into his bedroom, which he

13   let them do, and they saw a laser on his bedside table.  And

14   only then did he admit that he had lasers.

15          And only after that when they confronted him with

16   this lie did he say, okay, yeah, I'm the one who did it and

17   the laser that I used I hid, I took out the batteries and

18   hid it behind a backboard.  He made efforts to conceal what

19   he had done so he certainly knew that he had done something

20   very serious and it was criminal.

21          **THE COURT:**  Okay.

22          **MR. GOLD:**  Judge, could I just respond to a couple

23   of things there?

24          **THE COURT:**  Go ahead.

25          **MR. GOLD:**  Well, we never argued -- and this

1    happened during the trial as well -- that Mr. Sasso did not

2    point the thing intentionally at the direction of it, that's

3    not the argument.  The argument is this is a tiny device

4    powered by two AAA batteries.  And, you know, and it's made

5    to be a stargazer.  That's what they're called.  They send

6    out a little beam of light.  You're supposed to point them

7    out in the sky and when you do that, you don't expect it to

8    hit the star.

9           One of the statements that was attributed to

10   Mr. Sasso based on our review of what occurred on the night

11   of his arrest was that he actually said I didn't know it

12   could reach that far.  He certainly realized it when there

13   was a helicopter sitting on top of his house with a night

14   sun shining on top of it and he realized that he probably

15   got himself into a lot of trouble.

16          Again, when Mr. Weinreb says that he was a lot

17   closer, again, it's not like it's coming directly at them.

18   The pilots testified it was making a lazy S pattern to avoid

19   being detected.  And it was the testimony that sometimes it

20   was the subjective impression of the pilot that they flew

21   into it and sometimes that it was tracking them.  That is

22   just the testimony.

23          We camped out at Mr. Sasso's house on several

24   nights.  It's sort of a misnomer to say that people came

25   into his bedroom.  His whole apartment is essentially a

1    cramped little bedroom with a little back window populated

2    with stuff.  The stuff that he buys and collects, the

3    artwork that he spends, you know, kind of obsessive hours

4    just kind of putting together.

5         And while we were there, the one point that we

6    tried to bring out at trial, probably not successfully, was

7    that this helicopter at the height that the testimony put it

8    at and at the distance, a thousand feet at two miles away,

9    was directly, flew directly along the line of the roof

10   pattern that Mr. Sasso sees when he sits at his back window.

11   So it's not preposterous or beyond the pale that some of

12   these contacts -- and we're not saying all of them -- were

13   incidental to Mr. Sasso smoking his cigarettes and pointing

14   it out at other things.  There were only five.  That's once

15   a minute or one every two minutes of this conduct.  The

16   testimony was between five and ten minutes.

17        So you can give it the character that the

18   government does but you don't have to.  There is other ways

19   to read what happened.

20        Also, I do want to point out just a little bit of

21   legislative history, Judge.  This statute was pulled from

22   the Patriot Act.  In fact, the language that we are dealing

23   with was drafted, as far as I can tell, it first appeared in

24   18 U.S.C., 1993, under the Patriot Act with the 9/11

25   hijackers in mind.  That is where the language comes from.

1              There is a congressman named Ric Keller from the

2       Tenth District of Florida or something like that who for

3       like five years was trying to get the statute passed that

4       would make it illegal to do what Mr. Sasso I think did,

5       which was to point a laser on purpose at an aircraft flight

6       path or an aircraft.  It was a five-year maximum penalty, a

7       felony, but it never passed.  It was passed by both houses

8       in Congress.  I think it was just not signed into law for

9       reasons unrelated to the merits of the bill.  It was just in

10      July of 2010 they tried to pass it again.

11             When Mr. Weinreb says that we are saying that it

12      wasn't intentional, that's not right.  That's a

13      mischaracterization of what we're saying.  We are saying

14      that he didn't act with the intent to interfere with or

15      scare these pilots but that he did intentionally direct the

16      laser at the helicopter.  It's a very important distinction

17      and one in which, you know, when you look at the California

18      cases, they're very clear.

19             You have a lot of documents.  We cited it in the

20      papers.  Specific intent to interfere with those pilots,

21      wanted to get their attention, wanted to distract them, so

22      that's the type of thing, and that's in the language, and it

23      wasn't quite the way the case played out here because of

24      this sort of, I'll call it confusion.

25             And, again, you know, the government, I really want

1    to emphasize on behalf of Mr. Sasso, I don't know what

2    the -- we were able to find -- Mr. Weinreb did not cite

3    another case in which someone was caught, it's so difficult

4    to catch these individuals, Christopher Phaneuf up in

5    Lawrence.  I spoke with his attorney Charles Rankin.  He was

6    considered for federal prosecution.  It was in the paper.

7    Federal prosecution was declined.

8            According to Lieutenant Riley, the same pilot who

9    testified here, he was struck six times.  He was struck as

10   he landed.  He came to the kid's house and yelled at him and

11   now they have a CWOF with community service.  Because, you

12   know, Mr. Sasso is not a child but we also, we have a

13   psychiatric report.  We have a sort of building of the

14   context here of what was going on with him and a hefty

15   prison sentence is not warranted.

16           Thank you.

17       **THE COURT:**  Okay.  Mr. Sasso, you are about to be

18   sentenced.  As one who faces sentencing, you have the right

19   to address the Court, tell me anything that may be on your

20   mind if you would care to do so.  If you would prefer to

21   remain silent, you may remain silent without fear of being

22   prejudiced.

23           If you want to speak, go ahead.  If you don't, that

24   is okay.

25       **THE DEFENDANT:**  I'm all set, Your Honor.  I decline

1     to speak.

2              **THE COURT:**  You decline to speak?

3              **THE DEFENDANT:**  Respectfully I decline to speak.

4              **THE COURT:**  I can't hear you.

5              **MR. GOLD:**  He says respectfully he declines to

6     speak.

7              **THE COURT:**  Okay.  That is your right and I accept

8     that.

9              I am going to sentence you to three years in jail.

10    No fine.

11             What else?

12             **THE PROBATION OFFICER:**  The term of supervised

13    release is either two or three years.

14             **THE COURT:**  Two years supervised release.

15             **THE PROBATION OFFICER:**  You would recommend the

16    mental health treatment as a supervision condition?

17             **THE COURT:**  Okay.  You can put that in.

18             **MR. GOLD:**  Judge, he's voluntarily doing that.  Do

19    we need that as a condition?

20             **THE COURT:**  Yes.

21             **MR. GOLD:**  I mean, that is --

22             **THE PROBATION OFFICER:**  It would only help him

23    should he not follow these guidelines.

24             The other thing would be the $200 special

25    assessment.

1          **THE COURT:**  $200 special assessment.

2          **THE CLERK:**  Two hundred?

3          **MR. WEINREB:**  Yes, there were two counts.

4          **THE COURT:**  There are two counts, so it is 150?

5          **MR. WEINREB:**  No, it's 200 altogether.

6          **THE COURT:**  Two hundred altogether.

7          **MR. WEINREB:**  One hundred for each.

8          **THE COURT:**  Do you have any objection to any of the

9      special conditions?  The government?

10          **MR. GOLD:**  What were they besides the --

11          **MR. WEINREB:**  The government has no objection, Your

12      Honor.

13          **THE COURT:**  Do you want to hear them again?

14          **MR. GOLD:**  Could I hear them again?

15          **THE COURT:**  Sure.

16          **THE PROBATION OFFICER:**  Just the prohibition of any

17      dangerous weapon and then the mental health treatment.

18          **MR. GOLD:**  No.

19          **THE COURT:**  Okay.  Nobody has any objection?

20          All right.  Mr. Sasso, you have now been sentenced.

21      As one who has been sentenced, you have a right to appeal

22      that sentence if you would care to do so.  If you want to

23      appeal, you have 14 days now, it is either 10 or 14, I alert

24      you --

25          **THE CLERK:**  Fourteen.

1          **THE COURT:**  I think the law has just been changed

2    to 14 days to file a notice of appeal if it is your

3    intention to file such a notice.

4          If you don't have funds for a lawyer, one will be

5    provided for you.  If you don't have funds to prosecute an

6    appeal, you will be permitted to appeal without payment of

7    any fees.

8          Do you understand that?

9          **THE DEFENDANT:**  Yes, Your Honor.

10         **THE COURT:**  Okay.  Anything else?

11         **MR. GOLD:**  Your Honor, we'd ask for permission that

12    Mr. Sasso be allowed to self-report to the Bureau of

13    Prisons.

14         **MR. WEINREB:**  Your Honor, I object.  We've delayed

15    this sentencing again and again and again, in part so that

16    the defendant could have all the time he needed to get his

17    affairs in order.

18         **THE COURT:**  Yes, I think that the government's

19    objection is a reasonable one.  I am going to sustain it.

20         **MR. GOLD:**  Well, Your Honor, if I might just submit

21    that it would help his classification if he is allowed to

22    self-report.  As we said in our papers, he is an

23    ex-correctional officer with psychiatric issues.  It would

24    simply be helpful to him for that reason.  He is prepared.

25    He got a ride here today.  He has his medications with him.

1   But it would be helpful to him if he is allowed to

2   self-report.

3          **THE COURT:**  I have already made that ruling.  I am

4   not going to do it.

5          Anything else?  Anything else?

6          **MR. WEINREB:**  Nothing from the government, Your

7   Honor.

8          (Whereupon, the Court and the Clerk conferred.)

9          **THE COURT:**  You have to stay here so we can turn

10  him over to the marshals now.

11         (Pause in proceedings.)

12         **THE COURT:**  Okay.  You can sit down back there.

13         You can either stay with him or you don't have to

14  stay with him.

15         **MR. GOLD:**  Well, I have got some other things to do

16  but I will stay with him.

17         **THE CLERK:**  Can you sit in the back?

18         **MR. GOLD:**  We will sit in the back.  I'm sorry, I

19  didn't know your schedule.

20         **THE COURT:**  Well, you don't have to stay here if

21  you don't want to.  You don't, he does.

22         **THE CLERK:**  Court is in recess.

23         (WHEREUPON, the proceedings were recessed at 2:55

24         p.m.)

25

# C E R T I F I C A T E

 

       I, Carol Lynn Scott, Official Court Reporter for the United States District Court for the District of Massachusetts, do hereby certify that the foregoing pages are a true and accurate transcription of my shorthand notes taken in the aforementioned matter to the best of my skill and ability.

 

       /S/CAROL LYNN SCOTT

_____

       CAROL LYNN SCOTT
       Official Court Reporter
      John J. Moakley Courthouse
    1 Courthouse Way, Suite 7204
     Boston, Massachusetts 02210
       (617) 330-1377

**DATE: January 25, 2011**